IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

TERRY GIEVER,

      Plaintiff,

v.                                                                                    No. Civ. 08-155 LH/LAM

CITY OF LAS CRUCES CITY COMMISSION
and LAS CRUCES POLICE OFFICERS
"JOHN DOES 1-5", in their official capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On April 1, 2009, Defendant filed a Motion for Summary Judgment and Memorandum in Support (Doc. 51). The Court, having considered the motion, briefs, evidence, arguments, relevant law, and otherwise being fully advised, finds that the motion should be **granted** and that Plaintiff's claims should be **dismissed**.

## I.  FACTUAL BACKGROUND

### A.  Crash and Arrest

On January 6, 2006, Plaintiff was driving his vehicle in Las Cruces, New Mexico. (Def.'s Mot. for Summ. J. (Doc. 51) ("Def.'s MSJ"), at Undisputed Fact ("UF") ¶ 5.) Plaintiff remembers pulling out of his home, stopping on the corner of Turrentine and Farney, and turning right. (Pl.'s Sur-Resp. (Doc. 72) UF ¶ 2.) Plaintiff does not, however, remember any of the events preceding his arrest, including running his vehicle into a mailbox and colliding with a car; nor does Plaintiff have any reason to dispute the eyewitness accounts of Deithra Archie or Amanda Bowen. (Def.'s MSJ, Ex. A, 36-37 & UF ¶ 4.)

Deithra Archie observed Plaintiff traveling east on Farney Avenue as she was traveling

westbound on Farney.  (Def.'s MSJ ¶ 6.)  She noticed Plaintiff's vehicle because it crossed over into her lane, nearly hitting her. (*Id.* ¶ 7.)  Plaintiff's vehicle then hit a mailbox and swerved back into the eastbound lane.  (*See id.*)  Ms. Archie made a U-Turn to get a license plate on the vehicle and a number for the house where the mailbox had been hit. (*Id.* ¶ 8.)  She followed Plaintiff to a stop light at Farney and El Paseo and saw Plaintiff drive through the red light.  (*Id.* ¶ 9.)

Amanda Bowen also witnessed Plaintiff's vehicle at the intersection of Farney and El Paseo. (*Id.* ¶ 11.)  Ms. Bowen had a green light at the intersection, (*id.* ¶ 12); however, she saw  Plaintiff's vehicle, which was traveling eastbound on Farney, run the red light at Farney and El Paseo.  (*Id.*) Plaintiff then hit the opposing curb on El Paseo.  *Id.*  Ms. Bowen witnessed Plaintiff weave back and forth between the two northbound lanes on El Paseo.  (*Id.* ¶ 13.)  She watched Plaintiff hit the opposing curb at least twice; each time Plaintiff would correct and weave back towards the center lane.  (*Id.* ¶ 14.)   Ms. Bowen called 911 as she followed Plaintiff north on El Paseo.  (*Id.* ¶ 17.)

At the intersection of El Paseo and Boutz, there is a turn lane for drivers turning to the right, or east.  (*Id.* ¶ 16.)  Plaintiff did not use the turn lane.  (*Id.*)  Although the light was green for northbound traffic, Plaintiff stopped, made a right-hand turn heading east on Boutz, and collided with another vehicle.  (*Id.*) At the scene of the collision, Ms. Bowen spoke with Plaintiff about whether he had been drinking or whether he was on any medications.  (*Id.* ¶ 18.)  Plaintiff reported that he was on medications.  (*Id.*)

Officer Sebero Torres, an officer of the Las Cruces Police Department ("LCPD"), was dispatched to the intersection regarding the vehicle crash.  (*Id.* ¶¶ 20-21.)  While en route to the accident, dispatch informed Officer Torres that Plaintiff's vehicle was likely related to the hit-and-run crash that occurred on Farney, as the same vehicle description and license information was associated with that crash.  (*Id.* ¶ 22.)  When Officer Torres arrived and contacted Plaintiff, he

observed that Plaintiff was unbalanced, unsteady on his feet, and swaying heavily.  (*Id.* ¶ 23.)  Other individuals at the scene indicated to Officer Torres that Plaintiff was impaired.  (*Id.* ¶ 24.)  Additionally, Officer Torres noticed that Plaintiff's eyes had "a lot of nystagmus," or were bouncing back and forth, which strengthened his belief that Plaintiff was impaired.  (*Id.* at ¶ 25.)

Plaintiff reported to Officer Torres that he had been involved in a previous severe car crash and that he suffered from chronic pain as a result. (*Id.* ¶ 26.)  When Officer Torres asked Plaintiff if he was taking any medication, Plaintiff responded that he was taking Neurontin, Oxycontin, Seroquel, and other medications.  (*Id.*)  He informed Officer Torres that he last took medications around 3:00 p.m., approximately two-and-one-half hours before the first dispatch.  (*See id.* ¶ 29.)  Officer Torres asked Plaintiff how the medications made him feel.  (*Id.* ¶ 27.)  Plaintiff responded that the medications made him feel sleepy and dizzy and that he sometimes falls down or wants to fall down.  (*Id.*)  Officer Torres also asked Plaintiff whether his doctor had ever instructed him not to drive while taking the medications.  (*Id.* ¶ 28.)  Plaintiff indicated that he had been instructed not to drive.  (*Id.*)

At the scene of the accident, Officer Torres attempted to administer Field Sobriety Tests ("FSTs").  (*Id.* ¶ 31.)  Because Plaintiff was swaying so heavily, Officer Kristina Herrera stood next to Plaintiff to make sure that he did not fall.  (*Id.* ¶ 30.)  Plaintiff could not get into the instructional stance for the walk-and-turn test.  (Def.'s MSJ, UF  ¶ 33.)  Officer Joe Triste, who was also at the scene, intervened and discontinued the test out of concern for Plaintiff's safety.  (*Id.*; Pl.'s Appendix, Ex. E, 11.)  Officer Torres directed Plaintiff to begin the one-leg-stand test but discontinued that test as well because Plaintiff could not pick any foot off the ground without losing his balance.  (Def.'s MSJ, UF ¶ 34).  Officer Torres also conducted the horizontal gaze nystagmus test and observed all six clues.  (*Id.* ¶ 32.)  Because the nystagmus was severe, Officer Torres concluded that Plaintiff was

under the influence of medications.  (*Id.*)  Officer Torres excluded alcohol based on Plaintiff's

admission that he did not drink and because he detected no odor of alcohol.  (*Id.*)  Additionally,

Officer Torres  observed that Plaintiff appeared disheveled and that his zipper was unzipped.  (*Id.*

¶ 35.)  Based on all of Officer Torres' observations, the information that he had about the hit-and-

run accident on Farney Avenue, and the information that he had about the other traffic violations,

Officer Torres placed Plaintiff under arrest.  (*Id.* ¶ 36.)

Taking into account what Plaintiff had told him about a previous severe car crash, Officer

Torres utilized two sets of handcuffs, so that Plaintiff's hands were about a foot apart behind his

back.  (*See id.* ¶ 37, Ex. D, at 11.)  During the course of Plaintiff's arrest, Plaintiff did not sustain

a head injury, was not taken to the ground, was not arrested with a knee in his back, and his arms

were not twisted.  (*See id*. UF ¶ 38.)  Neither Plaintiff nor the officers fought while Plaintiff was

handcuffed, and both Plaintiff and the officers remained cordial to one another throughout their

interactions.  (*See id.* ¶ 40.)  Although Plaintiff has claimed a generic physical injury to his wrist

caused by the handcuffs, it is undisputed that there is no medical evidence that the handcuffing

caused any injury to Plaintiff.  (*See id.* ¶¶ 38-39.)

At the scene, Officer Triste also spoke with Plaintiff's significant other, Elizabeth Kuchler,

who told him that she was a nurse.  (*See* Pl.'s Sur-Resp., UF ¶ 6.)  Officer Triste does not recall

whether Ms. Kuchler told him that Plaintiff suffered from a seizure disorder or that the FSTs could

harm him.  (*See id.* ¶ 7.)  However, John Giever[1] was present during Ms. Kuchler's conversation

with Officer Triste, and he recalls that Ms. Kuchler told Officer Triste about Plaintiff's back

problems and nerve damage, that these issues would cause Plaintiff to have trouble taking the one-

---

[1] The record is unclear as to John Giever's relationship with Plaintiff, Terry Giever.  However, there is no
dispute that he was a witness at the scene.

leg-stand test, that Plaintiff could injure himself, and that the officers should not handcuff Plaintiff behind his back because his wrists had been injured.  (*See* Pl.'s Resp. (Doc. 59), Ex. F, at 12, 14-15.)[2]

### B.      Alcohol and Drug Testing

After his arrest, Plaintiff was transported to the Las Cruces police station.  *See id.* at ¶ 40. While at the station, Officer Adrian De La Garza, administered a breath test, the result of which was 0.00.  (*Id.* ¶ 41.)  The standard procedure used by LCPD officers after a breath alcohol content registers 0.00 is to call a Drug Recognition Expert ("DRE").  (*See id.* ¶ 71.)  Accordingly, Kiri Daines, a certified DRE was called.  (*Id.* ¶¶ 42-43.)

During Officer Daines' evaluation of Plaintiff, he informed her about his prior car crash and resulting injuries, and he admitted to taking numerous medications, including Fentanyl, Ambien, Pepcid, Neurontin, Ablify, Seroquel, and Oxycontin.  (*Id.* ¶ 47.)[3]  After Plaintiff informed Officer Daines that he had a seizure disorder and that he may have had a seizure during the collisions that preceded his arrest, Officer Daines instructed Officer Torres to call the fire department.  (*See id.* ¶ 45; Pl.'s Resp., DVD, at 19:44, 19:53.)  Officer Torres, in turn, called the fire department, noting

---

[2]Defendant objects on the grounds of hearsay to this testimony as to what Ms. Kuchler's expected testimony at trial would be.  The Court agrees that what John Giever heard Ms. Kuchler tell Officer Triste constitutes impermissible hearsay as to the truth of what Plaintiff's underlying condition was and as to how Ms. Kuchler would testify at trial.  Nevertheless, the fact that Mr. Giever observed Ms. Kuchler notify Officer Triste about Plaintiff's condition is not hearsay; nor is the statement hearsay with respect to the effect that it had on Officer Triste.  The Court will consider Mr. Giever's observations for these limited purposes.

[3]Although it is undisputed that Plaintiff informed Officer Daines on the night of the crash that he was taking Oxycontin and Fentanyl, among other drugs, he since has testified that he was not taking Oxycontin that night. (Pl.'s Appendix, Ex. A, at 117.)  He admits, however, that he was likely wearing a Fentanyl patch that night.  (*See id.*)

that Plaintiff was "previously having seizures."[4]   (*Id.* 19:45.)   The fire department arrived and examined Plaintiff.   (*See* Def.'s MSJ, Ex. D at 11; Pl.'s Resp., DVD, at 19:57-20:02.)   Plaintiff ultimately refused treatment.   (*Id.* ¶ 45.)

At the conclusion of Officer Daines' evaluation, she concluded that Plaintiff was under the influence of a narcotic analgesic and that some medical issues were contributing to his impairment. (*Id.* ¶ 46.)   Although Officer Daines initially told Plaintiff that blood would be drawn after fire rescue had assessed him, she never obtained a blood sample as part of her evaluation.   (*Id.* ¶ 75.) Plaintiff is the only individual on whom Officer Daines has completed a DRE examination without collecting a toxicological sample after determining impairment. (Pl.'s Sur-Resp., UF ¶ 24.)   Officer Daines does not know why she failed to obtain a toxicological sample from Plaintiff.[5]   (*Id.* ¶ 25.) The standard protocol and procedure used by LCPD DREs  includes obtaining a toxicological sample in the form of blood or urine.   (Def.'s MSJ, UF ¶ 72.)

## C.   Charges

After Officer Daines completed her examination of Plaintiff and determined that he was under the influence of drugs, Officer Torres completed his paperwork, including a criminal complaint charging Plaintiff with driving under the influence of alcohol or drugs, careless driving, improper right turn, running a red light, and improper use of traffic lanes.   (Def.'s MSJ, UF ¶ 49.) Plaintiff pled guilty (no contest) on July 24, 2007, to Careless Driving, Traffic Lanes, Red Light,

---

[4] Although Officer Torres testified that he did not learn that Plaintiff suffered from seizures during the course of his investigation, (Def.'s MSJ, Ex. D, at 17-18), he can be heard, in the video surveillance from the police department, calling the fire department at the request of Drug Recognition Expert Kiri Daines, noting that Plaintiff was "previously having seizures."   (Pl.'s Resp., DVD, at 19:45.)

[5] Although not cited by the parties, Officer Daines can be heard telling Plaintiff that she would not draw a blood sample.   (*See* Pl.'s Resp., DVD, at ~20:01.)   Officer Daines informed Plaintiff that she did think he was impaired on drugs but that his medical issues were over.   *Id.*

and Required Position & Method of Turning.  (*Id.* ¶ 74.)

**D.     Medical History**

Dr. Denise Leonardi is Plaintiff's primary care physician.  (*Id.* ¶ 50.)  According to Dr. Leonardi, Plaintiff was on the following medications as of the January 9, 2006 accident and arrest: Cymbalta, used for chronic pain and as an anti-depressant; Deconamine, an antihistamine/decongestant; Flonase, a nasal steroid; a prescription dosage of Ibuprofen, for pain; Seroquel, an anti-psychotic; Ambien, a sleep medication; Duragesic or Fentanyl, a narcotic pain medication; Lamictal, anti-seizure medication; and Prilosec, for heartburn.  (*Id.* ¶ 51.)  When Dr. Leonardi prescribes narcotic medications, such as Fentanyl, patients are generally told they should not operate a motor vehicle.  (*Id.* ¶ 53.)  According to Dr. Leonardi, someone who is taking a narcotic can have impaired judgment, depending on the amount that is in his or her body at a given time.  (*Id.* ¶ 54.)

Dr. Mario Aguilar is a physician who practices adult neurology, and he has seen Plaintiff since 1998 for tremors, numbness of the left hand, and episodes of seizures or "unresponsiveness." (*Id.* ¶¶ 55-56.)  According to Dr. Aguilar, Plaintiff began experiencing episodes of "unresponsiveness" at least as early as 2003, and as of January 2006, the unresponsiveness condition remained uncontrolled.  (*Id.* ¶¶ 57-58, 65. )

On October 28, 2004, Dr. Aguilar saw Plaintiff for unresponsiveness, and his assessment was unchanged.  (*Id.* ¶ 59.)  As of that day, Plaintiff was instructed to remain on a "no driving status," which is Dr. Aguilar's standard recommendation for patients experiencing episodes of unresponsiveness.  (*Id.* ¶¶ 60-61.)  Dr. Aguilar saw Plaintiff again on September 30, 2005, just over three months before Plaintiff's arrest, because Plaintiff continued to experience episodes of unresponsiveness.  (*Id.* ¶ 62.)  At that time, Plaintiff reported that his most recent episode of

7

unresponsiveness was three weeks earlier.  (*Id.*)

On January 31, 2006, 22 days after the arrest, Dr. Aguilar once more saw Plaintiff and noted that an episode of unresponsiveness had occurred "three days ago" and that a previous episode of unresponsiveness had occurred two weeks earlier "while driving. . . . Even though, he was not supposed to be driving . . . He apparently hit a mailbox."  (*Id.* ¶ 63.)  At no time between October 28, 2004, and January 31, 2006, did Dr. Aguilar make a determination that Plaintiff could drive. (*Id.*  ¶ 64.)  When Dr. Aguilar tells patients not to drive, he informs them of the risks of driving, including that they can injure themselves or others.  (*Id.* ¶ 66.)

### E.    Training Regarding Disabilities

LCPD officers receive training in excess of 800 hours at the State Academy, including a minimum of 16 hours dealing with individuals suffering from mental illness.  (*Id.* ¶ 67.)  In the training and instruction of LCPD officers for accommodating the disabled, several LCPD General Orders are utilized, including a General Order addressing Persons with Disabilities.  (*Id.* ¶ 68.) Officers are trained using National Highway Transportation Safety Administration (NHTSA) curriculum for driving while intoxicated ("DWI").  (*Id.* ¶ 69.)  According to Chief Harry Romero, the City has a policy dealing with the deaf and speech-impaired; however, Chief Romero was unaware of training that officers receive regarding other physical disabilities.  (*See* Pl.'s App., Ex. C.)  Officer Torres, however, received Academy training on physical disabilities that could affect a DWI assessment, including seizures and diabetes.  (*See* Def.'s MSJ,  UF ¶ 70; Ex. D, at 16.)

## II.      PROCEDURAL HISTORY AND PLAINTIFF'S CLAIMS

Plaintiff Terry Giever filed his Complaint *pro se*[6] in the Third Judicial District Court, County of Dona Ana on January 8, 2008.  Thereafter, on February 11, 2008, Defendants removed the action to this Court.  In his Complaint, Plaintiff asserts actions against the City of Las Cruces City Commission ("the City"); Eduardo Beckett, an Assistant City Attorney for the City of Las Cruces, in his official capacity ("Beckett");[7] and Las Cruces Police Officers "John Does 1-5," in their official capacities ("the LCPD Officers").

Construing the Complaint broadly, Plaintiff makes the following claims under Section 1983: 1) wrongful arrest (i.e. lack of probable cause) against the LCPD Officers in their official capacities and against the City; 2) malicious prosecution against the City; and 3) deliberate indifference to medical needs against the LCPD Officers in their official capacities and against the City.[8] Additionally, Plaintiff asserts the following claims under the New Mexico Tort Claims Act ("NMTCA"): 1) battery against the LCPD Officers and the City; 2) false arrest against the LCPD Officers and the City; 3) extreme emotional distress against the LCPD Officers and the City; and 4) malicious prosecution against the City.  Finally, Plaintiff makes a claim against the City for violation of the Americans with Disabilities Act ("ADA").

_____

[6] Although Plaintiff initiated this action as a *pro se* plaintiff, he has since retained counsel.  *See* (Doc. 13, Notice of Appearance by Mark D'Antonio); (Doc. 45, Order Granting Plaintiff's Motion to Substitute Attorney.) However, the Court will interpret Plaintiff's Complaint liberally.  *See Swoboda v. Dubach*, 992 F.2d 286, 289 (10th Cir. 1993).

[7] All claims against Defendant Eduardo Beckett have been dismissed with prejudice by this Court pursuant to a stipulation of the parties, (*see* Stipulated Order (Doc. 16)), leaving only claims against the LCPD Officers in their official capacities and claims against the City.

[8] Plaintiff does not explicitly state the constitutional rights the he claims were violated.  The Court will presume that he is alleging wrongful arrest and malicious prosecution under the Fourth Amendment and deliberate indifference to medical needs under the Eighth Amendment.

### III.   STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial.  *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *See Anderson*, 477 U.S. at 248.

## IV.     LEGAL ANALYSIS

### A.        § 1983 Claims

#### 1.        *Heck v. Humphrey* Analysis

Plaintiff pled guilty in State Court to various traffic offenses, including Careless Driving, Traffic Lanes, Red Light, and Required Position & Method of Turning (hereinafter collectively referred to as "the traffic offenses").  The City argues that until these State Court convictions are invalidated, Plaintiff's action is premature under *Heck*.  (Def.'s MSJ 14.)   Plaintiff, on the other hand, contends that any admissions that he made with respect to the traffic offenses do not preclude his civil claims against the City or relate to the facts and circumstances necessary to establish probable cause for an arrest of driving under the influence.  (Pl.'s Resp. 8.)

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the United States Supreme Court addressed the issue of when a person convicted of a state criminal charge may bring a § 1983 claim relating to his conviction or sentence.  The Court held that when such a person seeks damages in a § 1983 suit, the district court must consider whether a judgment in his favor would necessarily imply the invalidity of the underlying conviction.  *Id.* at 487.  If a judgment in the plaintiff's favor would necessarily imply the invalidity of that conviction, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  *Id.*  If, however, the court determines that the plaintiff's action, even if sucessful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action is not premature and should be allowed to proceed.  *Id.*

In *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553 (10th Cir. 1999), the Tenth Circuit considered the application of *Heck* in the context of a civil action arising out of the plaintiff's arrest on a rape charge.  *Id.*  There, the plaintiff's rape charge was dismissed; however, his probation was

11

revoked and his sentence on a previous conviction accelerated, based at least in part on the alleged

rape victim's testimony.  *Id.* at 556.  Ultimately, the Tenth Circuit determined that the plaintiff's

§ 1983 malicious prosecution claims related to his probation revocation were barred by *Heck*.  *Id.*

However, the plaintiff's § 1983 claims related to his arrest and to police conduct during his arrest,

including claims of illegal arrest (i.e. no probable cause for the arrest) and illegal search and seizure,

were not barred by *Heck*.  *Id.*  Ultimately, the question that the court considered in reaching its

conclusion was "whether a judgment in favor of the plaintiff would necessary imply the invalidity

of his conviction or sentence."  *Id.* at 557.

Applying *Heck* to a § 1983 malicious prosecution claim, the court in *Beck* determined that

because the plaintiff's rape charge and probation revocation were resolved in contradictory manners,

some of the plaintiff's malicious prosecution claims were barred by *Heck* while others survived.

More specifically, the malicious prosecution claim related to the plaintiff's probation revocation[9]

was barred by *Heck*; however, the malicious prosecution claim related to the plaintiff's rape charge

survived, because that charge was resolved in the plaintiff's favor, via dismissal.  Thus, this Court

must determine whether the relevant charges or convictions were resolved against Plaintiff or in his

favor.

In this case, Plaintiff pled "no contest" to the traffic offenses, so any malicious prosecution

claim related specifically to Plaintiff's traffic offenses is premature under *Heck* and must be

dismissed.  On the other hand, the malicious prosecution claim related to Plaintiff's DWI charge

survives the *Heck* analysis, as the DWI charge was resolved in Plaintiff's favor, via dismissal in both

municipal court and on appeal at State district court.

---

[9] The Tenth Circuit had on a previous occasion explicitly extended *Heck* to situations such as probation
revocations.  *See Crow v. Penry*, 102 F.3d 1086, 1087 (10th Cir. 1996).

12

In order for Plaintiff's other § 1983 claims to be barred by *Heck*, a judgment in Plaintiff's favor must necessarily imply that his convictions for the traffic offenses in State Court were invalid. However, if Plaintiff succeeded on his wrongful arrest claim, it would *not* imply that he was improperly convicted of running a red light or of careless driving. *Cf. State v. Sisneros*, 82 P.2d 274 (N.M. 1938) ("the crime of reckless driving and that of driving an automobile while under the influence of intoxicating liquor, are distinct offenses and are established by different evidence. A conviction of one would not be a bar to a prosecution for committing the other offense.") After all, Plaintiff does not claim that he did not commit the traffic offenses; nor does he offer any evidence to refute the eyewitness accounts of his erratic driving behavior. What Plaintiff disputes is that the police officers had probable cause to arrest him for DWI.

Defendant urges this Court to follow the *Heck* analysis employed in *Hunt v. Smith*, No. 2:03cv00194-WRW, 2008 WL 491678 (E.D. Ark. Feb. 19, 2008). There, the District Court for the Eastern District of Arkansas dismissed a plaintiff's § 1983 claim for wrongful arrest for DWI, reasoning as follows:

> [t]o find that there was no probable cause in connection with the [dismissed] DWI charges would be to find that there was no probable cause in connection with the driving left of center offense and refusing to submit offense. . . .[and] [a] finding that there was no probable cause to arrest Plaintiff in connection with driving left of center or refusing to submit would imply the invalidity of Plaintiff's conviction of those violations.

*Id.* at *6. However, the court's reasoning in *Hunt* is not consistent with the Tenth Circuit's rationale in *Beck*. In *Beck*, the court noted that "[p]olice actions toward a criminal suspect, such as arrest, interrogation, or search and seizure," even if unlawful, do not necessarily render a conviction invalid. *Beck,* 195 F.3d at 558. Wrongful arrest claims, by nature, relate to treatment by law enforcement and are not direct attacks on a conviction or possible conviction; therefore, such claims

13

are generally not covered by the *Heck* doctrine. *See Gonzalez v. Harvey*, No. 07cv577 BB/RHS, at *3 (D.N.M. Nov. 4, 2008); *see also Heck*, 512 U.S. at 487 n.7 ("Because of doctrines like independent source and inevitable discovery, and especially harmless error, such a § 1983 [unreasonable search] action, even if successful, would not necessarily imply that the plaintiff's conviction was unlawful.").

Moreover, even if the court's rationale in *Hunt* was consistent with the law in this circuit, its application to the present factual scenario would still not render Plaintiff's claims premature under *Heck*. In *Hunt*, the first step in the court's analysis was as follows: "[t]o find that there was no probable cause in connection with the DWI charges would be to find that there was no probable cause in connection with the driving left of center offense and refusing to submit offense." *Hunt*, 2008 WL 491678, at *6. But the same is not true of Plaintiff's DWI arrest and his traffic offenses. Again, Plaintiff does not suggest that the LCPD Officers lacked probable cause in connection with the traffic offenses or even that he is innocent of such offenses. Instead, Plaintiff maintains that his erratic driving was caused by a seizure, rather than a drug impairment, and that there was no probable cause to arrest him for DWI. Put simply, a lack of probable cause in connection with Plaintiff's DWI charge does not equate to a lack of probable cause in connection with the traffic offenses.

In *Beck*, the Tenth Circuit determined that claims related to either plaintiff's arrest or to police conduct during the course of his arrest were not barred by *Heck*, "because ultimate success on them would not necessarily question the validity of [his] conviction . . . or his probation revocation." *Beck,* 195 F.3d at 558. Likewise, those of Plaintiff's § 1983 claims that relate to his arrest and/or police conduct during the course of his arrest (i.e. his wrongful arrest claim and his

14

deliberate indifference to medical needs claim) are not barred by *Heck*.[10]  *See Gonzalez*, No. 07cv577 BB/RHS, at 3 (reasoning that claims alleging illegal arrest or illegal seizure of property are not covered by the *Heck* doctrine because such claims are not direct attacks on a possible conviction, and a conviction would not necessarily be rendered invalid if the plaintiff prevailed on his claims).

### 2.    *Monell* Analysis

Plaintiff has sued only the City and various "John Doe" police officers, all of whom were sued only in their official capacities.  Because an "official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159 (1985), Plaintiff's remaining claims are analyzed as claims against the City.  Consequently, Plaintiff's § 1983 claims must be analyzed under the standard set forth in *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 689 (1978).

In *Monell*, the Supreme Court ruled that municipalities cannot be held liable under § 1983 on a *respondeat superior* theory for merely employing a tortfeasor.  *Id.*  Municipalities, instead, are subject to § 1983 liability only when their official policies or customs cause a plaintiff's injuries.  *Id*. at 694; *Johnson v. Johnson*, 466 F.3d 1213, 1215 (10th Cir. 2006).  Indeed, there must be a direct causal link between the municipal policy or custom and the alleged constitutional deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  A municipal policy can take the form of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers," whereas a municipal custom includes "persistent and widespread . . . practices of . . . officials."  *Monell*, 436 U.S. at 690-91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

---

[10] Nevertheless, under *Heck*, the damages that Plaintiff may recover cannot include those for being convicted or imprisoned until the conviction has been overturned.  *Beck*, 195 F.3d at 558.

### a.     Wrongful Arrest

With respect to his § 1983 wrongful arrest claim, Plaintiff attempts to satisfy the *Monell* standard by suggesting that it was a municipal policy of failing to properly train officers that caused his wrongful arrest.  (Pl.'s Resp. 11-12.)  However, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Harris*, 489 U.S. at 388.  Put another way, failure to train must reflect a deliberate, conscious choice by a municipality in order for liability to attach.  *See id.* at 389.  Where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need," the city may be liable.  *Id.* at 390.

According to the Tenth Circuit, a litigant in Plaintiff's posture must prove the following: 1) that an officer violated a constitutional right of the plaintiff; 2) that the violation arose under circumstances that constitute a usual and recurring situation with which police officers must deal; 3) that the inadequate training demonstrated a deliberate indifference by the city toward persons with whom the officer comes into contact; and 4) that there is a direct causal link between the inadequate training and the unconstitutional conduct.  *See Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

Because the constitutional right implicated by Plaintiff's wrongful arrest claim is the Fourth Amendment right to be free from unreasonable seizures, the initial focus of the Court's inquiry is on the existence of probable cause.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). Defendant maintains that Plaintiff's arrest was at all times supported by probable cause and that, therefore, no constitutional violation occurred.  (Def.'s MSJ, at 17.)  Plaintiff, on the other hand, contends that the LCPD Officers lacked both reasonable suspicion to subject him to FSTs and

16

probable cause to arrest him for DWI.  (Pl.'s Resp. 11.)

Probable cause  to support a warrantless arrest exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent man to believe that the suspect has committed or was committing an offense.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "[I]n determining whether probable cause exists, the courts must apply the 'totality of circumstances' test."  *Brierley v. Schoenfeld,* 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).

Here, one witness observed Plaintiff cross the centerline, hit a mailbox, and leave the scene. Additionally, witnesses saw Plaintiff run a red light, swerve across traffic lanes, fail to use a turn-lane, and collide with another vehicle.  These undisputed observations regarding a myriad of traffic offenses committed by Plaintiff were relayed to the officers who arrived at the scene of the collision. Then, upon making contact with Plaintiff, the arresting officer, Officer Torres, noticed that Plaintiff appeared disheveled, was unbalanced and swaying heavily, and that his eyes had "a lot of nystagmus," or were bouncing back and forth.  Plaintiff made admissions to Officer Torres that he was taking various medications, including at least one narcotic, and that these  medications made him feel sleepy, dizzy, and want to fall down.  He also told Officer Torres that his physician had advised him not to drive.

Plaintiff laments that the LCPD Officers, in making their probable cause determination, "carefully listened to lay witness testimony regarding the crash, which conveniently supported their theory of DUI, while completely ignoring any relevant information coming from [Plaintiff's significant other]."  (Pl.'s Resp. 11.)  Significantly, a police officer may properly base a probable cause determination upon witnesses' statements, *see Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995), and need not credit claims of innocence by the arrestee himself or by his significant other,

*see Jackson v. Inhabitants of Town of Sanford,* No. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994) (concluding that although the arrestee attributed his slow response, slurred speech, and unsteadiness to a prior brain aneurysm, it was insufficient to defeat probable cause to arrest him for DWI).

Considering the information available to the LCPD Officers at the scene, the Court finds, as a matter of law, that reasonable suspicion existed to conduct FSTs on Plaintiff. *See Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) (concluding that a driver's statement that he had one beer three hours earlier provided at least arguable reasonable suspicion to conduct FSTs, where the New Mexico standard is "impaired to the slightest degree"); *Smith v. Ball State Univ.*, 295 F.3d 763 (7th Cir. 2002) (reasoning that officers had reasonable suspicion of criminal activity, where detainee was found in the driver's seat of a running vehicle that had come to rest on a sidewalk after officers received dispatch information that vehicle had veered onto a campus sidewalk, nearly hitting pedestrians).

With respect to the officers' probable cause determination, the Court notes that in addition to the previously-mentioned information available to officers, Plaintiff was also unable to even commence standard FSTs, let alone pass them. For example, Plaintiff could not get into the instructional stance for the walk-and-turn test; nor could he pick any foot off the ground for the one-leg-stand test. Additionally, upon administering the horizontal gaze nystagmus test, the arresting officer observed all six clues and determined that Plaintiff's nystagmus was severe.

Given the information available to the arresting officer, the Court finds, as a matter of law, that probable cause existed to arrest Plaintiff on a charge of DWI.[11] *See Inhabitants of Town of*

---

[11] Defendant contends that Plaintiff's decision to operate a motor vehicle, with knowledge that his physician had instructed him to do otherwise and with knowledge that he was susceptible to periods of

*Sanford*, 1994 WL 589617 at *2 (determining that the officer had probable cause to arrest the plaintiff because, given the extent of the officer's knowledge -- that the plaintiff had slow responses, slurred speech and swaying, unsteady movements -- he reasonably believed that the plaintiff had been driving while impaired by drugs or alcohol, even though the plaintiff was actually suffering from physical disabilities caused by a stroke); *Thompson v. Olson*, 798 F.2d 552, 556-57 (1st Cir. 1986) (concluding that officers had probable cause to arrest a plaintiff who was suffering from insulin shock, where the officers did not have information that would lead a reasonable officer to suspect that the plaintiff's problems were medically based rather than drug or alcohol induced). Because probable cause existed to arrest Plaintiff, no constitutional violation occurred. Because no constitutional violation occurred, Plaintiff's attempt to hold the City liable under a failure-to-train theory likewise fails.

Moreover, even if a constitutional violation had occurred, Plaintiff presents no evidence to show that the City had deliberate indifference to the constitutional rights of its citizens, much less any evidence of causation linked to such an indifference. To the contrary, the record shows that the arresting officer had training specifically dealing with disabilities, including seizures, and that he had training in DWI enforcement based on NHTSA curriculum. Additionally, Academy training for Las Cruces Police Department officers includes over eight-hundred hours of training approved by the state, including training on mental illness and physical disabilities. Without evidence showing that some lack of training caused a constitutional violation, Plaintiff's § 1983 wrongful

---

unresponsiveness, would have justified a reckless driving charge. (Def.'s Reply, at 7.) That Plaintiff could have been arrested for reckless driving further solidifies the Court's determination that probable cause existed for Plaintiff's arrest. *See Buck v. Gonzales*, 549 F.3d 1269, 1281 (10th Cir. 2008) (reasoning that the legality of an arrest may be established by proving that there was probable cause to believe that the arrestee committed a crime other than the one charged, provided that the crime for which the arrest was made is somehow related to the crime for which probable cause exists).

arrest claim fails.  *See, e.g., Carr*, 337 F.3d at 1232.

> **b.      Malicious Prosecution**

The parties' summary judgments briefs omit any discussion of a § 1983 malicious prosecution claim, focusing instead on Plaintiff's § 1983 wrongful arrest claim.  However, Plaintiff's Complaint plainly asserts such a claim against the City. (*See* Complaint ¶¶ 42, 47.) Moreover, the Tenth Circuit has recognized the viability of malicious prosecution claims under § 1983.  *Taylor v. Meacham*, 82 F.3d 1556, 1560 (10th Cir. 1996).

However, the touchstone of a § 1983 action against a governmental body is an allegation that official policy is responsible for deprivation of rights protected by the Constitution.  *Monell*, 436 U.S. at 690.  Even construing Plaintiff's Complaint broadly, he does not allege that the City had some policy or custom that resulted in his malicious prosecution; nor does Plaintiff argue as much in his responsive brief.  Accordingly, Plaintiff's § 1983 malicious prosecution claim fails to meet the *Monell* standard.

Even putting aside Plaintiff's failure to articulate some policy or custom that caused his malicious prosecution, his claim fails for an independent reason.  While the common law elements of malicious prosecution are the analytical starting point for a § 1983 malicious prosecution claim, the ultimate question is whether the plaintiff has proven a Fourth Amendment constitutional violation.  *Id.* at 1561.  Accordingly, a plaintiff must establish that there was "no probable cause to support the original arrest, continued confinement, or prosecution."  *Pierce v. Gilchrist*, 359 F.3d 1279, 1288 (10th Cir. 2004).  The Court has already determined that there was probable cause, as a matter of law, for Plaintiff's arrest and detainment, and Plaintiff has offered no evidence suggesting that probable cause somehow dissipated prior to his criminal prosecution.  For all of these reasons, Plaintiff's § 1983 malicious prosecution claim against the City fails.

20

**c.      Deliberate Indifference to the Medical Needs**

The parties' summary judgments briefs also omit discussion of Plaintiff's § 1983 deliberate indifference to medical needs claim.  Yet Plaintiff's Complaint can be read to assert such a claim. (*See* Complaint ¶ 46) (alleging that the LCPD Officers' actions were "taken with deliberate indifference to [Plaintiff's] medical condition").

As with Plaintiff's § 1983 malicious prosecution claim, however, Plaintiff's Complaint lacks any allegation that the indifference to his medical needs was pursuant to an unlawful municipal policy or practice.  And, once again, Plaintiff does not articulate any such policy or practice in his responsive brief.  As such, Plaintiff's deliberate indifference to medical needs claim, like his other § 1983 claims, fails to satisfy the *Monell* standard.

Plaintiff's deliberate indifference to medical needs claim fails for a more substantive reason as well: he fails to meet either the objective or subjective component of the test for such a claim. The objective component of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause."  *Mata v. Saiz*, 427 F.3d 745, 752-53 (10th Cir. 2005).  Here, Plaintiff does not specify the "serious harm" that he suffered from Defendant's alleged indifference to his medical needs.  Again, Plaintiff has presented no medical testimony establishing that his wrists were injured when he was handcuffed.  Nor does he present evidence of any other harm suffered during his period of detainment, much less harm rising to the level of "sufficiently serious."

Secondly, the subjective component of the test requires a plaintiff to show that "the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)**.**  The inquiry is whether the plaintiff's symptoms were such that the officers knew the specific risk but

recklessly chose to disregard it. *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009). Apparently, the specific risk of which Plaintiff complains is a risk of having a seizure or complications from a seizure. But Plaintiff has not presented evidence to create an issue of material fact regarding Defendant's subjective disregard of such a risk. To the contrary, the evidence on the record leads to a determination that the officers had no reason to know at the time of Plaintiff's arrest and transport to the police station that Plaintiff suffered from a seizure disorder or may have experienced a seizure. Rather, Plaintiff's behavior and his admissions were entirely consistent with prescription drug impairment. In fact, the evidence available to the Court shows that as soon as officers became aware that Plaintiff may have a seizure disorder, or that he may have experienced a seizure during the accident, they contacted the fire department to assess him. The video surveillance from the police department shows the fire department responding and speaking with Plaintiff. Ultimately, Plaintiff signed a form refusing treatment.

Because Plaintiff has failed to submit evidence satisfying either the objective or subjective test for a § 1983 deliberate indifference to medical needs claim and because Plaintiff has failed to meet the *Monell* standard for the claim, his § 1983 deliberate indifference to medical needs claim fails.

### B.    New Mexico Tort Claims Act Claims

Plaintiff claims against the City under the New Mexico Tort Claims Act ("NMTCA") include battery, false arrest, extreme emotional distress, and malicious prosecution.

#### 1.    Battery

A governmental entity, such as the City, may sometimes face liability when its law enforcement officers, while acting within the scope of their duties, commit certain torts. *See* NMSA 1978 § 41-4-12. With respect to Plaintiff's battery claim, however, Defendant argues that the

LCPD Officers' conduct, throughout the course of Plaintiff's arrest and detainment, was not insolent or angry, but cordial, and that officers used a reasonable amount of force, acted in good faith, and had probable cause when they handcuffed Plaintiff.  Therefore, Defendant contends that Plaintiff's battery claim should be dismissed as a matter of law.  In contrast, Plaintiff suggests that it was unnecessary under the circumstances for the LCPD Officers to handcuff him, particularly behind his back.  Plaintiff also contends that he sustained injury to his wrists as a result of the handcuffing, ultimately requiring surgery, though he presents no evidence to this effect.[12]  (Pl.'s Resp., at 10.)

Unfortunately, New Mexico law does not clearly define the elements of tortious battery.  In fact, the committee that drafted the New Mexico Uniform Civil Jury Instructions noted uncertainty in this respect when it declined to issue uniform instructions for battery claims.  UJI 13-1624, NMRA Civ. ("The committee spent much time over a period of several months studying the matter of intentional torts . . . . It was finally concluded that there was insufficient New Mexico law on . . . battery to guide the committee on this subject.").  No doubt because of the undefined nature of tortious battery law, the parties take different approaches in discussing the applicable elements.  Defendant applies the elements of criminal battery to Plaintiff's tort claim, while Plaintiff turns to Fourth Amendment excessive force law.

This Court has, at times, followed the approach of Defendant, defining the elements of tortious battery via NMSA 1978, § 30-3-4 of the New Mexico criminal code.  *See, e.g., Garcia v. Jaramillo*, No. 05-1212 JB/RLP, 2006 WL 4079681, at *8 (D.N.M. Nov. 27, 2006).  Under § 30-3-4 battery is "the unlawful, intentional touching or application of force to the person of another, when

---

[12]  Although Plaintiff initially argues that the handcuffing caused injuries to his wrist necessitating surgery, he plainly admits in his Sur-Response that there is no medical documentation to support such a claim of injury. *Compare* (Def.'s MSJ, at UF ¶ 39) ("There is no medical evidence that the handcuffing caused any injury to Plaintiff.") *with* (Pl.'s Sur-Resp., at ¶ 39) ("Admit.").

done in a rude, insolent or angry manner." § 30-3-4.

More recently, however, this Court, New Mexico State courts, and the Tenth Circuit have applied elements arguably more in line with the Restatement (Second) of Torts §§ 18-19 (1965). *See, e.g.*, *St. John v. McColley*, No. 08cv994 BB (D.N.M. Sept. 8, 2009).   Under this approach, a battery occurs "when an individual acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of contact and . . . an offensive contact with the person of the other directly or indirectly results."   *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1209 (10th Cir. 2006).   Here, the Court concludes that – whether battery is defined in terms of unlawful, intentional touching done in a rude, insolent, or angry manner OR  harmful or offensive intentional contact – the LCPD Officers who contacted and handcuffed Plaintiff did not commit a tortious battery.

First, the LCPD Officers' interactions with Plaintiff were undisputably cordial.  No physical struggle occurred during Plaintiff's arrest or detainment, nor was Plaintiff taken to the ground or handcuffed with a knee in his back.  Plaintiff does not allege that his arms were twisted, that his cuffs were adjusted too tightly, or even that the position of his hands or arms caused him to experience pain during the course of his arrest or transport to the police station.  Moreover, video surveillance from the police station depicts the officers interacting with Plaintiff in a pleasant and professional manner, repeatedly asking him if he is experiencing physical discomfort.  (*See, e.g.*, Pl.'s Resp., DVD, at 19:17-19:24.)  Thus, even construing the facts in Plaintiff's favor, there is no evidence that Plaintiff's handcuffing or the officers' other contact with Plaintiff was rude, insolent, or angry.

Nevertheless, under Tenth Circuit law, a plaintiff's allegations could amount to a tortious battery if the contact – even if courteous and professional – would "offend a reasonable sense of

personal dignity." *Fuerschbach*, 439 F.3d at 1209.  More to the point, the Tenth Circuit has concluded that "the acts of 'subduing' and 'handcuffing' are undoubtedly offensive to a reasonable sense of personal dignity." *Id.* (citing *Love v. Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988)).

Even so, an officer is permitted a privilege under New Mexico law for the use of force, including handcuffing, so long as the force is not in excess of that which the actor reasonably believed to be necessary. *Beldsoe v. Garcia*, 742 F.2d 1237, 1240 (N.M. Ct. App. 1984); *Mead v. O'Connor*, 344 P.2d 478, 479 (N.M. 1959).  Officers, within these reasonable limits, "are the judges of the force necessary to enable them to make arrests or to preserve the peace.  When acting in good faith, the courts will afford them the utmost protection." *Mead*, 344 P.2d at 480.  Under New Mexico law, then, an officer or entity may successfully defend against a charge of battery by demonstrating that 1) the officer used no more force than reasonably was necessary, and 2) the officer acted in good faith.  *See id.* at 479-80.  Indeed, New Mexico courts have demonstrated willingness to grant summary judgment to police officers when the facts show that they acted reasonably under the circumstances.  *See, e.g., id.*; *Romero v. Sanchez*, 895 P.2d 212, 215 (N.M. 1995); *Perea v. Stout*, 613 P.2d 1034, 1039 (N.M. Ct. App. 1980).

Here, Plaintiff has not presented evidence that his handcuffing was either unnecessary or unreasonable.  Although, construing the facts in Plaintiff's favor, Plaintiff's significant other may have urged the arresting officer, Officer Torres, not to handcuff him behind his back because of pre-existing injuries, there is no dispute that the arresting officer attempted to accommodate Plaintiff's injuries by utilizing two sets of handcuffs, such that Plaintiff's hands were approximately a foot apart behind his back.  Officer Torres testified that as a matter of policy arrestees are not handcuffed in the front because of the hazard that it would pose to officer safety.  (*See* Def. MSJ, Ex. D, at 13:21-25.)  Additionally, Plaintiff was handcuffed only *after* Officer Torres determined that there

25

was probable cause to believe that he had been driving under the influence and *just prior* to being transported to the police station for administration of a breath test and examination by a DRE. Furthermore, Plaintiff presents no evidence that he asked officers to loosen or remove his handcuffs or that he complained that they were uncomfortable.  Under these circumstances, the handcuffing of Plaintiff, using two sets of handcuffs, was not in excess of that which an officer would reasonably believe to be necessary in order to transport and detain a suspected impaired driver.

Although Plaintiff's arguments are focused on the unnecessariness of his handcuffing, the lawfulness of the arrest itself may also be relevant to his battery claim.  *See* NMSA § 30-3-4 (providing that criminal battery is "*unlawful*, intentional touching" ) (emphasis added). However, because this Court concludes that the officers had probable cause to arrest Plaintiff for DWI, *see supra* Part IV.B.1., the handcuffing of Plaintiff and concomitant physical contact was lawful as well as reasonable.

The Court concludes, even construing the facts in favor of Plaintiff, that the LCPD Officers' contact with Plaintiff in handcuffing him did not amount to battery.  Accordingly, Defendant has demonstrated that it is entitled to judgment as a matter of law in its favor on Plaintiff's battery claim.

### 2.    False Arrest or False Imprisonment

"The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dept. of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007).  The torts of false arrest and false imprisonment are similar in that a false arrest is merely one way of committing false imprisonment.  *Id.*  Notably, "[a]n officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest." *Id.*  Because the Court has determined that the LCPD Officers here

had probable cause to arrest Plaintiff, *see supra* Part IV.B.1., it follows that Plaintiff's False Arrest

or False Imprisonment claim under the NMTCA must be dismissed.

### 3.      Malicious Abuse of Process

Plaintiff's only remaining malicious prosecution claim under the NMTCA is against the

City.[13]  Plaintiff asserts that this claim is made against the City based on "the actions of Assistant

Attorney Beckett in maliciously prosecuting [him]."[14]  (Complaint 7.)  Because Plaintiff contends

that "all actions taken by Eduardo Beckett were taken in the scope and course of his employment,"

(Complaint, at ¶ 3), Plaintiff's claims against the City must be considered in light of the limitations

of the NMTCA. *Abalos v. Bernalillo County Dist. Atty's Office*, 734 P.2d 794 (N.M. Ct. App. 1987)

(holding that a governmental entity with supervisory authority over a negligent public employee

may be vicariously liable in an action under the NMTCA for actions taken by that  employee that

were in the scope and course of their employment if the public employee meets one of the waiver

exceptions under the Act).  Thus, a specific waiver of immunity must exist for Beckett, the public

employee who allegedly committed acts constituting malicious prosecution, in order for the City to

---

[13] This Court previously dismissed with prejudice all claims against Defendant Eduardo Beckett ("Beckett"), the Las Cruces City Attorney who prosecuted Plaintiff for his traffic offenses, pursuant to a stipulation by the parties.  *See* (Stipulated Order (Doc. 16).)  Yet Plaintiff now maintains that his surviving state-law malicious prosecution claim arises from conduct taken by Beckett and is being made against Beckett in his "official capacity." (Pl.'s Resp., at 10.)  Curiously, Plaintiff states that he "fails to recall or see any supporting documentation of his intention to release Mr. Beckett in his Official capacity."  (Pl.'s Resp., at 10.)  However, review of Plaintiff's Complaint indicates that Mr. Beckett was "being sued in his official capacity," (Complaint, at ¶ 3), and the Stipulated Order dismisses with prejudice "all claims" against Mr. Beckett.  (Stipulated Order, at 1.)  Accordingly, no claims against Beckett remain, in his official capacity or otherwise.

[14] For purposes of this claim, the Court assumes without deciding that a malicious prosecution claim against a municipality alone is a viable claim under New Mexico law.  Admittedly, courts in some jurisdictions have determined that malicious prosecution actions cannot lie against a municipality.  *See, e.g., Franklin v. City of Huntsville*, 670 So.2d 848 (Ala. 1995) (reasoning that a municipality cannot be deemed to act with malice). However, malicious prosecution actions against municipalities may well be available to New Mexico plaintiffs.  *See Brown v. Village of Deming*, 243 P.2d 609 (N.M. 1952) (imputing malice and bad faith of village trustees, in prosecuting larceny complaint, to municipality).  In any event, Plaintiff's state-law malicious prosecution claim against the City fails because no waiver exists for the allegedly wrongful conduct of the City's employee, Eduardo Beckett.

face liability.  If the NMTCA does not provide a specific waiver, the City is immune from suit.  *See*

NMSA 1978 § 41-4-4(A).

Plaintiff makes the conclusory assertion that immunity for all of his NMTCA claims is

waived under NMSA § 41-4-12.  (Complaint 7.)  Section 41-4-12 provides as follows:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by *law enforcement officers while acting within the scope of their duties*.

§ 41-4-12 (emphasis added).  A law enforcement officer, in turn,  is defined by the Act as follows:

> a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor.

 § 41-4-3(D).

Here, there is no indication that Beckett's principal duty under the law was to hold in custody

any person accused of a criminal offense, to maintain public order, or to make arrests for crimes.

To the contrary, Beckett, performing duties as a prosecutor, fails to meet the definition of a law

enforcement officer under the NMTCA .  *See Abalos*, 734 P.2d at 801 ("Plaintiff has not directed

our attention to any provision in the law that requires the district attorney, his assistants or personnel

to hold prisoners in custody . . . By definition, then, these defendants are not law enforcement

officers.").  Accordingly, without an applicable waiver under the NMTCA, the City is immune from

liability for Plaintiff's state-law malicious prosecution claim.  *See* NMSA 1978 § 41-4-4(A).  Such

claim is hereby dismissed.

### 4.      Extreme Emotional Distress[15]

As with all of Plaintiff's NMTCA claims, Plaintiff alleges that Defendant's immunity for

his "extreme emotional distress" claim has been waived under NMSA § 41-4-12.  *See* (Complaint,

at 7.)  However, as noted above, the NMTCA provides immunity to governmental entities unless

the Act sets forth an explicit waiver of that immunity.  *See* NMSA § 41-4-4.  While § 41-4-12 does

enumerate some torts for which a defendant's immunity may be waived, the tort of "extreme

emotional distress" is not among them; nor are the torts of intentional infliction of emotional distress

or negligent infliction of emotional distress.   *See* § 41-4-12.  Claims under the NMTCA made

against police officers, or in this case a governmental entity sued on the basis of police officers'

conduct, must implicate a tort for which immunity has been expressly waived in the statute's text.

*See Weinstein v. City of Santa Fe*, 916 P.2d 1313, 1320 (N.M. 1996).  Because the plain text of §

41-4-12 does not include "extreme emotional distress" or a related tort, Defendant is immune from

liability for such claims.  *See Weinstein*, 916 P.2d 1313 (holding that family members could not sue

for negligent infliction of emotional distress under the NMTCA, because § 41-4-12 did not include

that tort).  Without any applicable waiver under the NMTCA, Plaintiff's "extreme emotional

distress" claim must be dismissed.

### C.      Americans with Disabilities Act Claim

Title II of the Americans with Disabilities Act ("ADA") prohibits discrimination in public

services furnished by governmental entities.  42 U.S.C. § 12131-12165.  Title II provides that:

> [N]o qualified individual with a disability shall, by reason of such disability, be

---

[15] Plaintiff's claim for "extreme emotional distress" was not addressed by Defendant in its motion for
summary judgment.  However, Defendant did argue in its motion to dismiss that the NMTCA does not waive its
immunity for the tort of intentional infliction of emotional distress. (Def. Mtn. to Dismiss, at 6.)  Because the Court's
Stipulated Order disposed only of claims against Defendant Eduardo Beckett, Plaintiff's emotional distress claim
apparently remains.

> excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

In order to state a claim under the ADA, a plaintiff must prove 1) that he is a qualified individual with a disability; 2) that he was excluded from the benefits or services of a public entity or otherwise discriminated against by the public entity; and 3) that such exclusion, denial of benefits, or discrimination was because of his disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).

In *Gohier*, the Tenth Circuit addressed the question of whether a person with a disability could state a claim under the ADA based on police conduct during the course of an arrest or investigation. *Id.* at 1220. The court noted two potential theories for liability based on police conduct: the wrongful-arrest theory and the reasonable-accommodation-during-arrest theory. *Id.* at 1221. Ultimately, the court did not adopt either theory, determining instead that the former theory did not apply to the facts of the case and that the plaintiff had expressly declined to invoke the latter theory. *Id.* at 1221. Nevertheless, the court clarified that a broad rule categorically excluding arrests from the scope of the ADA "is not the law" and that it remained an "open question" whether the Tenth Circuit adopts either or both theories. *Id.*

The wrongful-arrest theory is implicated when the "police wrongly arrest[] someone with a disability because they misperceive the effects of that disability as criminal activity." *Id.* at 1220. For example, in *Lewis v. Truitt*, 960 F. Supp. 175 (S.D. Ind. 1997), the court found potential ADA violations where the deaf defendant alleged that the police arrested him because he could not understand what they were saying and did not properly respond to their requests. *Id.* at 178-79. Similarly, in *Inhabitants of Town of Sanford*, the court held that the ADA applied to a plaintiff who,

30

as a result of a stroke, had physical difficulties that were confused with intoxication and resulted in an arrest for DWI.  1994 WL 589617, at *1, 6.

The reasonable-accommodation-during-arrest theory, in contrast, may be implicated when police officers fail to reasonably accommodate a person's disability in the course of an investigation or arrest causing the person to suffer greater injury or indignity in that process than other arrestees. *Gohier*, 186 F.3d at 1220-21.  For instance, in *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the court determined that a paraplegic arrestee properly alleged an ADA violation after suffering injuries while being transported to jail in a van not equipped for wheelchair transport.  *Id.* at 913.

In this case, Plaintiff alleges that "the actions of [the City] in handcuffing [him] and forcing [him] to undertake a field sobriety test" constitute an ADA violation.  (Complaint, at ¶ 53.) It is unclear which theory Plaintiff relies on, if any.  In his responsive brief, Plaintiff focuses his argument on the City's alleged failure to train, arguing that the ADA requires the City to train its officers on seizure symptoms and care and that the failure to offer such training gave rise to his wrongful arrest.

### 1.      Failure to Train

The legislative history of the ADA may lend some support Plaintiff's failure-to-train argument.  For instance, the House Judiciary Committee stated that

> [i]n order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability.  For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in the recognition of and aid of seizures.  Such discriminatory treatment based on disability can be avoided by proper training.

H.R. Rep. No. 101-485(III), 101st cong., 2d. Sess. 50, *reprinted in* 1990 U.S.C.C.A.N.

However, even if the ADA requires seizure-specific training, and even if the lack of such

training amounts to a violation of the ADA, Plaintiff presents no evidence that the City failed to provide such training.  To the contrary, the undisputed testimony of Officer Torres is that he received training at the Academy regarding disabilities, such as seizures, that could affect a DWI investigation.  Incidentally, the Drug Recognition Expert, Officer Daines, also demonstrated some degree of sensitivity to seizure disabilities during the course of her examination. In the video surveillance recording from the police station, Officer Daines can be heard acknowledging Plaintiff's position that he may have had a seizure, expressing concern about his condition, and requesting that the fire department be called to assess him.  (*See* Pl.'s Resp., DVD, at 19:23-19:47; 19:53-19:55.)  Moreover, Plaintiff has failed to present evidence that any purportedly inadequate training regarding seizure disorders somehow culminated in discriminatory treatment on the basis of his disability.

In short, Plaintiff has not created a genuine issue of fact with respect to an ADA violation on the basis the City's alleged failure to train regarding seizure disorders.

## 2.     *Respondeat Superior* Liability

Even though Plaintiff has insufficient evidence that the City failed to properly train its officers, this alone does not foreclose liability under the ADA.  *Respondeat superior* liability may exist under the ADA, whereby liability would be imposed upon the City for the statutory violations of its police officers.  *See, e.g., Rosen v. Montgomery County Maryland*, 121 F.3d 154, 157 n.3 (4th Cir. 1997) (noting that under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir.1994) (same with respect to the ADEA); *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279 (7th Cir.1995) (same with respect to the ADA); *Bonner v. Lewis*, 857 F.2d 559, 566-567 (9th Cir.1988) (same with respect to the Rehabilitation Act).

However, like his ADA claim premised on the failure to train, Plaintiff's ADA claim premised on the *respondeat superior* theory, if any, fails to survive summary judgment, even assuming that the theories discussed by the *Gohier* Court are cognizable in this circuit.

###### a.      Wrongful-Arrest Theory

First, assuming that Plaintiff could prove that he is a qualified individual with a disability, it cannot be said that the LCPD Officers "knew or should have known" that a seizure disorder rendered his conduct legal. *See Lewis*, 960 F. Supp. at 178.  For one thing, there is no reason apparent to the Court that Officer Torres should have known, at the time of Plaintiff's arrest, that a seizure disorder may have caused or contributed to Plaintiff's erratic driving.  Rather, there was probable cause, based on Plaintiff's own admissions, to believe Plaintiff was driving under the influence of prescription drugs.  Although Plaintiff makes conclusory allegations that his significant other  informed the LCPD officers at the accident scene of his seizure disorder, the evidentiary record does not support as much.  Instead, the evidence before the Court is that Officer Triste remembers Ms. Kuchler disclosing that she was a nurse but does not remember her informing him that Plaintiff suffered from a seizure disorder.  Moreover, Officer Torres did not, at least during the course of his investigation, learn that Plaintiff suffered from seizures.  Finally, while John Geiver testified that he observed Ms. Kuchler informing one or more officer about Plaintiff's back problems and nerve damage, he makes no mention of Plaintiff's alleged seizure disorder.  Under these facts, Plaintiff has failed to create a genuine dispute as to whether the officers should have known of his seizure disorder at the time of his arrest.

Notably, this case can easily be distinguished from those cases in which officers had reason to know that a particular disability was causing certain conduct but nevertheless arrested a disabled plaintiff.  *See, e.g., Lewis*, 960 F. Supp. at 178-79 (determining that a genuine issue of material fact

33

existed with respect to the plaintiff's ADA claim, where the plaintiff presented evidence that the officers knew that he was deaf but refused to take steps to communicate with him and then arrested him because he did not respond appropriately).

Second, under the wrongful-arrest theory, a plaintiff's misperceived conduct must have been *lawful*. *See Gohier*, 186 F.3d at 1222 (reasoning that the officer did not "misperceive lawful conduct" as criminal activity, where the decedent's conduct – although it was likely caused by his disability – was not lawful); *see also Cyrus v. Town of Mukwanago,* No. 07-C-1035, 2009 WL 1110413 (E.D. Wis. Apr. 24, 2009) (accepting that plaintiff's conduct was the result of mental illness, but determining that his underlying conduct was unlawful, bringing it beyond the scope of the ADA).   Here, even if Plaintiff had demonstrated that his erratic driving was the result of a seizure rather than the influence of prescription drugs, something that remains unestablished, Plaintiff's underlying conduct – his careless driving – was still *unlawful*.  In fact, Plaintiff pled no contest to careless driving, among other charges, arising from the incident.  Additionally, Plaintiff's neurologist has testified that Plaintiff's driving was restricted at the time of his accident and arrest. Under 1978 NMSA § 66-8-113, "[a]ny person who drives any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others and without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property is guilty of reckless driving."  § 66-8-113.  Plaintiff's act of driving – not only while taking medications that made him sleepy, dizzy, and want to fall down but also during a time when he was suffering from continuing instances of unresponsiveness and after being directed by a physician not to drive – was a violation of § 66-8-113.  Thus, even if Plaintiff established that it was indeed a seizure that caused his erratic driving, it could still not be said that Plaintiff was arrested for purely *legal* conduct stemming from his disability.  For all of these reasons, Plaintiff's ADA

claim fails under a wrongful-arrest theory.

    **b.**    **Reasonable-Accommodation-During-Arrest Theory**

Under the reasonable-accommodation-during-arrest theory, Plaintiff essentially seeks to be excluded from FSTs and handcuffing on the basis of his disability.  Again, even assuming that Plaintiff could prove that he is a qualified individual with a disability, excluding him from FSTs and handcuffing would amount to excluding him from participation in two widely-recognized and neutral law enforcement practices that are already tempered by the Fourth Amendment reasonableness inquiry.  Yet the purpose of the ADA is to place individuals with disabilities on equal footing, not to give them an unfair advantage. *Kornblau v. Dade County*, 86 F.3d 193 (11th Cir. 1996); *see also Buchanan v. Maine*, 469 F.3d 158, 176 n.13 (1st Cir. 2006) (noting that "it is questionable whether the ADA was intended to impose any requirements on the police . . . tak[ing] someone into protective or other custody beyond the reasonableness requirement of the Fourth Amendment").

Further, even if the ADA would prohibit FSTs and handcuffing under some circumstances, or in light of some disabilities, the Court finds that, here, Plaintiff was reasonably accommodated with respect to both practices. *See McCray v. City of Dothan*, 169 F. Supp. 2d 1260, 1274 (M.D. Ala. 2001) (the extent and reasonableness of the accommodation involves a fact-specific, case-by-case inquiry).  At the time of Plaintiff's arrest, Officer Torres understood that Plaintiff had previously been involved in a severe car crash and suffered from chronic pain as a result. Additionally, construing the facts in Plaintiff's favor, Plaintiff's significant other had informed officers that Plaintiff suffered from back problems and wrist injuries and had urged the officers not to perform FSTs or to handcuff Plaintiff behind his back.  Even so, the officers commenced FSTs and ultimately handcuffed Plaintiff behind his back.  However, in doing so, the officers made

attempts to accommodate Plaintiff's physical injuries.  During the FSTs, for instance, one officer stood near Plaintiff to protect him from falling, and the FSTs were ultimately discontinued when the officers became concerned that Plaintiff might injure himself.  With regard to handcuffing, Officer Torres, once again, used two sets of handcuffs such that Plaintiff's hands were about a foot apart behind his back.  Although Plaintiff's significant other may have requested that Plaintiff be exempted from handcuffing and FSTs, that alone does not render the officers' actions unreasonable or violative of the ADA.       Even aside from the reasonableness of the officers' accommodation attempts, Plaintiff's ADA claim suffers another fundamental infirmity under the reasonable-accommodation-during-arrest theory.  Plaintiff offers no evidence demonstrating that either the FSTs or the handcuffing caused him any discernable physical injury; nor does he offer evidence that he was forced to suffer "greater indignity" than would other arrestees in his position.  Yet under the reasonable-accommodation-during-arrest theory, he must establish one of these injuries.  While Plaintiff makes the conclusory allegation in his responsive brief that he had to have surgery on each wrist because of the handcuffing, he later concedes that there is no medical evidence that the handcuffing caused injury to his wrists.  Additionally, Plaintiff presents no evidence establishing that he suffered "greater indignity" than would other arrestees in his position, and he does not even allege as much.  Plaintiff's lack of evidence of discernable injury is fatal to his ADA claim under a reasonable-accommodation-during-arrest theory.  *See Rosen*, 121 F.3d at 158 (concluding that a deaf arrestee, who alleged that police officers failed to accommodate his disability, did not establish an ADA claim, where he merely alleged that he suffered humiliation and embarrassment, which the court characterized as emotions that would be experienced by almost every person arrested for drunk driving).  In short, the undisputed material facts suggest that Plaintiff's disabilities were reasonably accommodated in light of the circumstances and the nature of law enforcement officers' duties.

36

## V.  CONCLUSION

For all of these reasons, the Court finds that summary judgment in favor of Defendant is appropriate on each of Plaintiff's claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 51) is hereby **GRANTED**.

_____

SENIOR UNITED STATES DISTRICT JUDGE

37